IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DERRICK TAYLOR,                              :

     Petitioner,                        :

v.                                           :        CIVIL ACTION NO. GLR-13-371

STATE OF MARYLAND,                           :

     Respondent.                        :

## MEMORANDUM OPINION

THIS MATTER is before the Court on Petitioner Derrick Taylor's Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254 (ECF No. 1). Having reviewed the Petition as supplemented (ECF Nos. 1, 3, 39), Respondent's responses and supplements thereto (ECF Nos. 46, 54), and Taylor's reply as supplemented (ECF Nos. 52, 59),[1] the Court finds no need for an evidentiary hearing. See R. Govern. § 2254 Cases U.S. Dist. Ct. 9(a); 28 U.S.C. § 2254(e)(2). For the reasons set forth below, the Court will deny the Petition and decline to issue a Certificate of Appealability.

## I.     BACKGROUND

On January 10, 2005, Taylor and an accomplice broke into a house for recovering addicts to retrieve money allegedly owed to him by Antwon Arthur. (Taylor v. State, Sept. Term 2007 No. 412 (Md.Ct.Spec.App. 2009) ["CSA Op."] at 3–4, ECF No. 46-4). Before leaving with money provided by another resident, Taylor shot and killed Arthur. (Id. at 4).

---

[1] Taylor's October 25, 2018 Motion for Extension of Time to file a reply (ECF No. 58) will be granted nunc pro tunc.

Steven Matthews and Nathan Gulliver, residents who witnessed Taylor shoot Arthur, were also shot and killed. (Id. at 6). Another resident "blacked out" during the incident and was unable to identify the assailants. (Id. at 5). A fifth resident, who was shot but not killed, unequivocally identified Taylor as the person who shot and killed Arthur. (Id. at 7). None of the witnesses saw whether it was Taylor or his accomplice who shot Matthews and Gulliver. (Id. at 9).

Taylor was charged with three counts of first-degree murder, two counts of attempted first-degree murder, two counts of first-degree assault, two counts of second-degree assault, one count of conspiracy to commit murder, one count of conspiracy to rob, five counts of use of a handgun in a felony or crime of violence, and five counts of wearing, carrying, or transporting a handgun. (Id. at 2).[2] Following a trial in the Circuit Court for Baltimore City, a jury convicted Taylor of three counts of felony murder, five counts of use of a handgun in a felony or crime of violence, five counts of wearing, carrying, or transporting a handgun, and one count of murder in the second degree. (Id.) The jury was unable to reach a verdict on the remaining charges, which were later abandoned upon the issuance of a nolle prosequi.[3] (Id. at 2).

Taylor's motion for a new trial was denied, and he was sentenced to three consecutive prison terms of life without the possibility of parole for the felony murder convictions, five consecutive twenty-year prison terms (to be served consecutively to the

---

[2] Citations to exhibit page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

[3] The State did not proceed on the conspiracy charges. (CSA Op. at 2).

life sentences) for the convictions for use of a handgun in the commission of a crime of violence, and five concurrent three-year prison terms for the convictions of wearing, carrying, or transporting a handgun. (Id.). The conviction for second-degree murder was merged into the felony murder convictions for sentencing purposes. (Id.).

On direct appeal, Taylor raised the following claims:

1.  the trial court erred in declining to propound two requested voir dire questions;

2.  the trial court committed plain error in failing to instruct the jury on the elements of robbery with a deadly weapon, which was the underlying felony in the felony murder charge;

3.  the jury rendered inconsistent verdicts by finding him guilty of using a handgun during the commission of a crime of violence with respect to victims Brown and Moreland, where it was unable to reach a verdict as to the underlying crimes of violence relating to those victims;

4.  the evidence was insufficient to support his convictions for felony murder;

5.  the trial court erred in failing to suppress or exclude victim Brown's in-court identification; and

6.  he should have been convicted of only one count of wearing, carrying, or transporting a handgun, and that conviction should be merged for sentencing purposes.

(Id. at 2–3). The Court of Special Appeals merged the sentences for several of the handgun offenses but otherwise affirmed the judgment in an unreported opinion filed on April 23, 2009. (Id. at 41–43). The Court of Appeals declined further review on August 24, 2009. (Taylor v. State, Sept. Term 2009 Pet. No. 166 (Md. Aug. 24, 2009) ["Cert. Denial"] at 1, ECF No. 46-5).

On November 3, 2010, Taylor filed a Petition for Post-Conviction Relief, which was scheduled for a hearing on March 4, 2013 but was withdrawn on February 4, 2013. (Post-

Conviction Pets. & Ops. ["Post-Conv. Filings"] at 3, ECF No. 46-6). On February 1, 2013, Taylor filed correspondence seeking "a stay on my federal habeas corpus review." (Pet. Writ Habeas Corpus ["Pet."] at 1, ECF No. 1). Taylor alleged that counsel representing him at state post-conviction proceedings in the Circuit Court for Baltimore City had withdrawn his petition due to counsel's medical recovery. (Id.). In his court-ordered supplement, Taylor outlined the history of his case and the grounds he intended to raise in this Court. (Suppl. Pet., ECF No. 3). On March 4, 2013, this Court granted a stay and abeyance in this case to permit Taylor to promptly refile his state post-conviction petition and provide regular reports to this Court concerning progress in that matter. (Mar. 4, 2013 Order at 4, ECF No. 5).

As outlined by the Circuit Court, on March 13, 2015, Taylor submitted a state post-conviction petition, which raised the following issues:

1. Trial counsel failed to file a motion for modification or reduction of sentence;

2. Trial counsel failed to inform the court of Petitioner's election to testify;

3. Trial counsel failed to object and request that the venire panel be questioned regarding racial bias;

4. Trial counsel failed to object to incomplete felony murder instructions;

5. Trial counsel failed to object to the non-unanimous verdict; and

6. Appellate counsel failed to raise the issue of the invalid verdict.

(Post-Conv. Filings at 3). The post-conviction court further noted that on July 13, 2015, Taylor filed an amended petition, raising the following additional arguments:

1. Trial counsel failed to object to omitted instructions;

    2.   Appellate counsel failed to raise allegations concerning the omitted instructions;

    3.   Trial counsel failed to secure the presence of Petitioner during jury communications; and

    4.   The cumulative effect of counsel's errors prejudiced his defense.

(Id.).

During a post-conviction hearing held on August 17, 2015, Taylor proceeded with these ten claims and argued ineffective assistance of trial counsel for failure to request an Allen charge.[4] (Aug. 17, 2015 Post-Conviction Tr. at 5–8, ECF No. 50-1). The parties stipulated to a belated filing of a motion for modification of sentence. (Id. at 59–60). On January 29, 2016, the Circuit Court for Baltimore City denied post-conviction relief. (Post-Conv. Filings at 13). Taylor sought leave to appeal the adverse ruling on the ten issues raised above. (Id. at 14–16).

The Court of Special Appeals granted Taylor's application for leave to appeal for the limited purpose of remanding the case to the Circuit Court for Baltimore City for resolution of whether counsel was ineffective for failing to object to the court's failure to instruct the jury on the unanimity requirement and the duty to deliberate. (Id. at 40). On November 22, 2016, the Circuit Court issued an opinion and order denying relief as to that issue. (Id. at 40–48). On May 1, 2017, Taylor's application for leave to appeal this ruling was summarily denied. (Id. at 63).

---

[4] An Allen charge is derived from an instruction given to a deadlocked jury as discussed in Allen v. United States, 164 U.S. 492 (1896), wherein the Supreme Court approved an instruction "in which the jury was specifically asked to conciliate their differences and reach a verdict." Kelly v. State, 310 A.2d 538, 539 n.1 (Md. 1973).

On May 12, 2017, Taylor signed an Amended Petition for Writ of Habeas Corpus, which was received for filing in this Court on May 19, 2017. (Am. Pet. Writ Habeas Corpus ["Am. Pet."], ECF No. 39). Those grounds for relief, covering five categories and encompassing issues presented in his original Petition, as supplemented, are:

1. The trial court erred by failing to:
   a. ask prospective jurors two requested voir dire questions;
   b. instruct the jury on the elements of robbery with a deadly weapon, essential to consideration of the underlying felony for felony murder;
   c. suppress in-court identification by witness/victim Brown.

2. The evidence was insufficient to sustain a conviction of felony murder.

3. Trial counsel provided ineffective assistance by failing to:
   a. object to an incomplete felony murder instruction;
   b. inform the court that Taylor wanted to testify;
   c. request a voir dire question concerning racial bias;
   d. object when the foreperson was not polled and the entire jury was not harkened following the verdict;
   e. object to omitted instructions requiring a unanimous verdict;
   f. object to the jury's announcement of a non-unanimous verdict;
   g. secure Taylor's presence at bench conferences discussing jury communications;
   h. file a motion seeking modification or reduction of sentence.

4. Appellate counsel provided ineffective assistance by failing to:
   a. question the validity of the verdict;
   b. raise an issue as to the omitted jury instructions.

5. The cumulative effect of all these errors led to Taylor's wrongful conviction.

(Am. Pet. Writ Habeas Corpus ["Am. Pet."] at  5–6, 8, ECF No. 39).

## II.    STANDARD OF REVIEW

The federal habeas corpus statute, 28 U.S.C. § 2254, as amended, sets forth a "highly deferential standard for evaluating state-court rulings." Lindh v. Murphy, 521 U.S. 320, 333 n.7 (1997); see also Bell v. Cone, 543 U.S. 447, 455 (2005). The standard is "difficult

to meet" and requires courts to give state court decisions the benefit of the doubt. <u>Cullen</u> <u>v. Pinholster</u>, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted); <u>see also</u> <u>Harrington v. Richter</u>, 562 U.S. 86, 102 (2011) ("If this standard is difficult to meet, that is because it was meant to be.").

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,]" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." <u>Williams v. Taylor</u>, 529 U.S. 362, 405 (2000). Under § 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Harrington</u>, 562 U.S. at 101 (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). A federal habeas court may not issue the writ simply because it concludes that the relevant state court decision applied established federal law incorrectly. <u>Renico v.</u> <u>Lett</u>, 559 U.S. 766, 773 (2010) (citing <u>Williams</u>, 529 U.S. at 411). Rather, that application must be "objectively unreasonable." <u>Williams</u>, 529 U.S. at 409. Thus, "an <u>unreasonable</u>

application of federal law is different from an <u>incorrect</u> application of federal law." <u>Harrington</u>, 562 U.S. at 101 (quoting <u>Williams</u>, 529 U.S. at 410).

Further, under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." <u>Wood v. Allen</u>, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. <u>Id.</u> (internal quotation marks and citation omitted).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." <u>Sharpe v. Bell</u>, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." <u>Id.</u> The Court will examine Taylor's claims through this analytical framework.

### III.   DISCUSSION

For reasons previously articulated by this Court, Taylor's habeas corpus Petition is deemed timely filed. (Feb. 24, 2015 Order at 3–4, ECF No. 20; <u>see also</u> June 19, 2017 Order, ECF No. 40). The State argues that several grounds Taylor presents in the Amended Petition are procedurally defaulted and that all of Taylor's grounds fail on the merits.

The narrative of the appellate court delineating the crime and trial, gleaned from the trial transcript, follows:

## FACTS AND LEGAL PROCEEDINGS

Jerome Moreland testified that on January 10, 2005, he was the house manager of a "recovery house," a place where people with substance or alcohol abuse problems live together to help each other recover, located at 541 West 27th Street in the Remington neighborhood of Baltimore City. Seven people lived in the house, all in various stages of recovery from substance abuse. Between 7:15 and 7:30 p.m. that evening, Moreland was in his room reading or watching TV.

At about 7:30, he heard an unusual noise and went downstairs, where he found an angry man with a gun in his hand. The man ordered him to take a seat with house residents Antwon Arthur, Steven Matthews, and Shawn Brown, who were already seated in the room. Moreland determined that the man's anger was directed at Arthur because Arthur apparently owed him money for drugs. He heard the gunman tell Arthur that innocent people would get hurt because of his actions. Believing he was going to die, Moreland remained seated with his chin in his hands, looking at the floor, throughout the entire incident. As a result, he did not get a good look at the gunman's face.

Shawn Brown testified that on the evening of the shooting, he was in the television room of the recovery house with Antwon Arthur and Nathan Gulliver when the gunman, whom he identified as appellant, entered. Steven Matthews was on his bed behind a curtain in the same room but was ushered into the television area with the others. When it appeared that appellant was about to hit Arthur with the gun, Gulliver stepped in, asked appellant how much Arthur owed him, and offered to go to an ATM to get the money out of his own account. Appellant yelled out the window to another person to take Gulliver to an ATM and bring him back with the $125 owed by Arthur. Gulliver then left with the accomplice[1] and was gone for a few minutes. During that time, Moreland entered the room, and appellant simply paced back and forth with the gun at his side.

When Gulliver returned, appellant took the money Gulliver had obtained and told the other residents of the house to give him any money they had, but none of them had any. Then, he shot Arthur in the head. Appellant and the accomplice struggled over control of the gun, and, reacting to the shooting, Brown ran toward the closed window and jumped through it. He heard a shot and felt something hit him in the back. He also heard a few other shots but did not feel them. He did not see which man fired the gun at him, but he believed it to be the accomplice. When he hit the ground, he started running until he collapsed in a nearby yard; someone called for an ambulance, which took him to Shock Trauma.

After the gunman shot Arthur, Moreland looked up to find the gunman's weapon pointed at him. He heard a gunshot and, although he was not hit by a bullet, he blacked out. When he opened his eyes, the gunmen were gone. Moreland, in shock, left the house. When questioned by police, he was unable to make a positive identification of the gunmen.

Witnesses David Carter and Edward Hall testified that on the evening of January 10, 2005, they were standing on the corner of 27th and Hampden Streets "shoot[ing] the breeze" as they did almost every night. At about 7:45 they heard a "loud crash" and then multiple gunshots coming from the corner of 27th and Sisson Streets. Carter saw a black male, presumably Brown, run down 27th Street and into an alley; he called 911. A few minutes later, Carter and Hall saw two men walk briskly from the side of the building at 541 West 27th Street and get into a dark colored four door car with white lettering or a white magnetic sign on the passenger door. Once the pair got into the car, they drove off down Sisson Street.

Baltimore City Police Officer Michael Lang responded to Carter's 911 call. Upon his arrival at the scene, he observed Brown, who said he had been shot, lying on the ground bleeding. After questioning Brown, officers proceeded to a house around the corner at Sisson and 27th Streets. As Lang arrived there, Moreland approached his vehicle and told him that three of his roommates had been shot. Lang entered the house's second floor apartment through an open door. Therein, he discovered three bodies, all shot in the head. Dr. Theodore King, of the Office of the Chief Medical Examiner of

Maryland, testified that all three homicide victims, Gulliver, Matthews, and Arthur, died of a single gunshot wound to the head fired either at very close range or while in direct contact with the head.

After police received information about a possible boyfriend/girlfriend link to the murders, Detective Charles Bealefeld of the Baltimore City Police Department's Homicide Unit interviewed appellant's girlfriend, Inshallah "Lisa" Owens, and found appellant to fit the physical description of the suspect given by Brown. The phone number at Owens' home was listed in the name of appellant, Derrick Taylor.

Based on the investigation, police created a photo array and showed it to Brown on January 12, 2005, while he was still in Shock Trauma. Brown testified that he was on morphine and oxycontin for pain at the time of the photo array identification, but the medication did not affect his ability to think; it only "killed the pain." He estimated that he had spent 30 to 40 minutes with the gunman on the evening of the shooting, and, at the time of the identification two days later, the shooter's face was still very fresh in his mind. He identified appellant from the photo array in less than five seconds. On the back of the photo array, in the remarks section, Brown wrote "I saw this gentleman shot Antwan [sic] in the head," and he signed it. After his release from the hospital, he again identified appellant from a second photo array. He identified appellant at trial as the shooter, saying that he knew it was appellant who put the gun to Arthur's head and shot him.

Upon Brown's identification of him as the shooter, appellant was arrested on January 13, 2005. The search and seizure warrant executed at appellant's apartment yielded no murder weapon, ammunition, items belonging to any victim, bloody clothing, drugs, drug paraphernalia, or paperwork indicating drug dealing. Further, no fingerprints, DNA, or other physical evidence was found at the crime scene linking appellant to it.

At trial, Owens, appellant's girlfriend, testified that, at the time of the shooting, she worked at the Bruning Paint Company as a paint filler. Victim Antwon Arthur was a co-worker and friend. In November or December, 2004, Arthur told Owens he was having financial difficulties, so she lent him money and

also introduced him to appellant so Arthur could make money selling marijuana for him.

By January, 2005, Arthur owed Owens $30 and appellant $125. On the two work days before his death, Arthur did not come to work at Bruning Paint. This upset Owens because Arthur owed her money and could not give it to her if he was not there. She told other co-workers that she "didn't want to have to send [her] boyfriend to [Arthur's] house to whip his ass because he was cool with [her]." On January 10, Owens told appellant that Arthur had not appeared for work. After she left work that day, she went to a bar. When she later returned to the apartment she shared with appellant, she found him and a friend, Antwand Brown, in the kitchen drinking brandy. She went to bed, but was later awakened by people arguing about "a gun or something." She recognized the voices as belonging to appellant and "Corey," a friend of appellant's. Appellant came into the bedroom and told Owens that he had hurt Arthur. She found out a few days later from homicide detectives that Arthur had been killed.

Genevieve McCloud, a co-worker of Owens', testified that Owens was agitated when Arthur did not appear at work on Friday, January 7 or Monday, January 10, 2005 because she thought he was "ducking her out." Owens told McCloud that she would send her boyfriend over to beat Arthur up. When Arthur did not appear for work on Tuesday, January 11, 2005, McCloud suspected something had happened to him at the hands of Owens' boyfriend because she had seen on the news that people had been shot in a recovery house. McCloud called and provided information to police.

After the foregoing testimony, the State rested its case, and appellant moved for judgment of acquittal on the following bases. With regard to the first degree murder charges relating to Matthews and Gulliver, the only two witnesses, Moreland and Brown, were unable to provide evidence that it was actually appellant who shot those victims. Moreland "didn't look at anyone and didn't focus on the events because he was petrified, he stared down toward the floor" and passed out. When he came to, the gunmen had left the room, so Moreland did not witness the murders of Matthews and Gulliver. Brown testified that he saw appellant shoot Arthur, but then he jumped

out the window, so he did not see the shootings of Matthews and Gulliver. Appellant further argued there was no physical evidence linking him to any of the shootings.

As for the charges of carrying, wearing, or transporting a handgun and using a handgun in crime of violence against Matthews and Gulliver, as there were no witnesses to the shootings of those victims, appellant contended that the State failed to make its case. With regard to the murder of Arthur, although Brown witnessed the murder, he made his identification of appellant as the shooter while in the hospital under the influence of potent painkillers and without benefit of his reading glasses, raising an issue as to the validity of the identification. Owens' testimony about appellant's involvement in Arthur's murder, appellant continued, was not credible due to the numerous lies she had admittedly told to police.

Appellant further argued that as for the attempted murder of Brown, Brown believed he was shot by the second gunman, not appellant, but he did not see who fired the gun in any event. With regard to the attempted murder of Moreland, Moreland was not injured, so no specific intent to attempt to murder him was shown. Finally, as to the conspiracies to commit robbery and to commit Arthur's murder, appellant argued that Owens told her co-workers she might have to have her boyfriend "kick his ass or beat him up or something along those lines," but there was no mention of any sort of robbery or robbery with a deadly weapon so as to support a conspiracy theory. The trial judge denied the motion for judgment of acquittal in its entirety.

The defense called Thomas Rafter, the original prosecutor on the case, and Jeffrey Kinstler, appellant's original public defender, about a communication that occurred between Detective Bealefeld and witness Brown prior to the hearing on appellant's motion to suppress the photo array. Rafter testified that on March 13, 2006, during the suppression hearing, he saw Detective Bealefeld talking to witness Brown outside the courtroom. He later found out that Bealefeld had been trying to calm Brown's nerves by alerting him to the fact that the alleged shooter was in the courtroom. Rafter advised Kinstler that witnesses were speaking to each other in contravention of the witness sequestration order. Rafter did not, however,

believe the communication between the witnesses had any impact on the motion to suppress the photo array.

The defense rested its case. Appellant again moved for judgment of acquittal incorporating and adopting all arguments made during his earlier motion for judgment of acquittal. The trial judge again denied the motion. The trial judge instructed the jury, and neither party took exception to the instructions as given.

After several days of deliberations, the jurors reached a unanimous verdict on some counts but were unable to reach a verdict on others. The trial judge declared a mistrial as to the counts on which the jury could not reach a verdict. Appellant moved for a new trial on the basis that a question the trial judge refused to propound upon jury voir dire did not allow him to examine potential jurors as to their bias for or against drug addicts, alcohol users, or those recently released from prison. Appellant also raised the issue of inconsistent verdicts with regard to two handgun counts because the jury found him guilty of using a handgun in a crime of violence against Brown and Moreland but was unable to reach a verdict on the crimes of violence.

The trial judge, in denying appellant's new trial motion, stated that he had considered and rejected the proposed voir dire question as the "area was covered very well and very thoroughly throughout the entire voir dire process." The potential jurors were informed as to what the case involved and were told that the events occurred at a recovery house. Additionally, they were asked whether there was any matter not covered that would prevent them from rendering a fair and impartial verdict, and no one responded in the affirmative. The trial judge further ruled that inconsistent verdicts were permissible in criminal cases and that the evidence was "more than sufficient to support the verdicts."

(CSA Op. at 3–12) (footnotes omitted). The Court now turns to examination of Taylor's grounds for relief, as categorized above.

A.    **Trial Court Error**

Taylor contends the trial court erred by failing to ask two voir dire questions of prospective jurors, failing to instruct the jury on the elements of robbery with a deadly weapon, which he deems essential to consideration of the underlying felony needed to support a conviction for felony murder, and failing to suppress an in-court identification by victim Brown. The Court considers each argument in turn.

1.    **Voir Dire**

The trial court declined to ask potential jurors two questions submitted by defense counsel relating to addiction and possible racial bias. Taylor argues that the failure to question jurors as to racial bias is plain error. The State contends that the trial judge properly exercised his discretion in declining to ask the question about whether prospective jurors gave money to organizations that assisted those in recovery. The State further argues that trial counsel did not object to the trial judge failing to question jurors as to racial bias, thus failing to preserve the issue for post-judgment review.

The process of examining prospective jurors to determine the existence of any bias or prejudice implicates the guarantees of the Sixth Amendment. See Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981). Without adequate voir dire, the trial court cannot fulfill its responsibility to eliminate jurors who will not be able to follow the court's instructions and evaluate the evidence. Id. (citing Connors v. United States, 158 U.S. 408, 413 (1895)). But with few exceptions, the trial court has broad discretion in determining how best to conduct voir dire. See id.; Morgan v. Illinois, 504 U.S. 719, 729 (1992); United States v. McDonnell, 792 F.3d 478, 496 (4th Cir. 2015), vacated and remanded on other

grounds, 136 S.Ct. 2355 (2016); United States v. Lancaster, 96 F.3d 734, 738 (4th Cir. 1996).

The Court of Special Appeals examined Taylor's arguments concerning voir dire using these standards, noting that the scope of voir dire is limited in Maryland to questions designed to ascertain the existence of cause of disqualification, and for no other purpose. (CSA Op. at 13 (citing Curtin v. State, 903 A.2d 922, 928 (Md. 2006))). The appellate court further explained that Maryland law requires the trial court to probe certain areas of inquiry if reasonably related to the case before the court, including race, ethnicity or cultural heritage, religious bias, weight placed on credibility, violations of narcotics laws, strong emotional feelings regarding allegations of sexual assault against a minor, and, in capital cases, the ability of a juror to convict based on circumstantial evidence. (Id. at 14–15 (citing Curtin, 903 A.2d at 932 n.8)).

As to Taylor's first ground for relief, the appellate court found that voir dire examination regarding possible bias was not required because the victims were recovering addicts or parolees and the examination, at most, would permit "fishing" to improperly exclude prospective jurors:

> In this matter, toward the end of the jury voir dire, defense counsel requested the inclusion of the question: "Does anyone work for, volunteer for, or make contributions to any government agency, charitable organization, religious group, educational organization, or non-profit agency which serves individuals who are drug addicts, alcohol abusers, or individuals recently released from prison?" The judge responded that he did not like the question but would ask if anyone had a bias against treatment facilities or halfway houses as a more general question. Defense counsel objected, stating that her concern was not a bias against such facilities but a bias

16

for them in that potential jurors who have made contributions to such facilities want to see that particular population treated well, and the residents of the recovery house were not, to say the least, treated well in this case. The judge declined to ask the question but noted counsel's exception.

The question as requested by defense counsel does not fall within any of the mandatory areas of inquiry noted above. Rather, it is of the "speculative, inquisitorial, catechizing, 'fishing,' 'open-ended'" type that should not be asked of a potential juror. Appellant was accused of murder and related offenses. Potential juror bias for or against drug addicts, alcohol users, or individuals recently released from prison does not go directly to the nature of the crime. The fact that the victims were residents of a recovery house and all of them were recovering addicts and/or recent prison releasees was completely incidental to the crime. That the potential jurors worked for, volunteered for, or gave money to agencies serving the victims' population would not provide a basis for a strike for cause. At most, the question provided a fishing opportunity to the defense in making its peremptory challenges.

Additionally, as noted by the trial judge at the hearing on appellant's motion for new trial, he had considered and rejected the proposed voir dire question as the "area was covered very well and very thoroughly throughout the entire voir dire process." The potential jurors were informed as to what the case involved and were told that the events occurred at a recovery house. They were also asked whether there was any matter not covered that would prevent them from rendering a fair and impartial verdict, and no one responded in the affirmative. The trial judge did not abuse his considerable discretion in failing to propound the question.

(Id. at 15–16) (citations omitted).

Taylor's allegation concerning voir dire to determine racial bias likewise fails. Under Maryland law, a trial judge is required to question prospective jurors about certain forms of bias to the extent they are "directly related" to the crime, the witnesses, or the defendants. Curtin, 903 A.2d at 928, 930; Washington v. State, 40 A.3d 1017, 1028 (Md.

2012) (citing <u>Dingle v. State</u>, 759 A.2d 819, 826 (Md. 2000)). While recognizing the importance of Sixth Amendment guarantees, in Maryland, "the sole purpose of voir dire is to ensure a fair and impartial jury by determining the existence of cause for disqualification, and not as in many other states, to include the intelligent exercise of peremptory challenges." <u>Washington</u>, 40 A.3d at 1020.

Taylor, who is African-American, argues that because one of the victims was white, prospective jurors should have been questioned concerning racial bias.[5] On direct appeal, Taylor conceded that he did not object to the trial court's failure to propound his question, as required under the Maryland rules, but asked the Court of Special Appeals to review the matter under the plain error doctrine. The appellate court declined to do so, finding no indication of prejudice suffered as a result of the trial judge's failure to ask the question. <u>Id.</u> at 19. This Court agrees. Nothing in the record suggests a "reasonable possibility," <u>see</u> <u>Rosales-Lopez</u>, 451 U.S. at 191, that racial prejudice or bias concerning those in recovery influenced the jury in this case or was inextricably bound up with the conduct of the trial, creating substantial indications of the likelihood of prejudice affecting the jurors.

## 2.      **Improper Jury Instruction**

Taylor contends that the trial court failed to instruct the jury on the elements of robbery with a deadly weapon, which was essential to consideration of the underlying

---

[5] The proposed question read: "The accused in this case is African American. Does any member of the panel feel that he or she is unable to reach a fair and impartial verdict simply because the accused is African American?" (CSA Op. at 16). The appellate court noted that there was no discussion on the record about this proposed voir dire question and thus it was unclear whether the trial judge affirmatively chose not to propound the question or simply inadvertently omitted it. (<u>Id.</u> at 16–17 & n.7).

felony establishing felony murder. The State counters that this claim is not constitutionally cognizable or was unpreserved for appellate review and thus subject to the procedural default doctrine. This Court agrees with the State that this claim is procedurally defaulted.

Where a petitioner has failed to present a claim to the highest state court with jurisdiction to hear it, whether by failing to raise the claim in post-conviction proceedings or on direct appeal, the procedural default doctrine applies. See Coleman v. Thompson, 501 U.S. 722, 749–50 (1991) (failure to note timely appeal); Murray v. Carrier, 477 U.S. 478, 489–91 (1986) (failure to raise claim on direct appeal); Murch v. Mottram, 409 U.S. 41, 46 (1972) (failure to raise claim during post-conviction); Bradley v. Davis, 551 F.Supp. 479, 481 (D.Md. 1982) (failure to seek leave to appeal denial of post-conviction relief). A procedural default also may occur where a state court declines "to consider [the] merits [of a claim] on the basis of an adequate and independent state procedural rule." Yeatts v. Angelone, 166 F.3d 255, 260 (4th Cir. 1999).

As the United States Court of Appeals for the Fourth Circuit has explained:

> If a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim. See Coleman v. Thompson, 501 U.S. 722, 731–32, 111 S.Ct. 2546, 2554–55, 115 L.Ed.2d 640 (1991). A procedural default also occurs when a habeas petitioner fails to exhaust available state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." Id. at 735 n.1[.]

Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998). If a procedural default has occurred, a federal court may not address the merits of a state prisoner's habeas claim unless the

petitioner can show (1) both cause for the default and prejudice that would result from failing to consider the claim on the merits, or (2) that failure to consider the claim on the merits would result in a miscarriage of justice, that is, the conviction of one who is actually innocent.[6] Murray, 477 U.S. 478 at 495–96; Breard, 134 F.3d at 620. "Cause" consists of "some objective factor external to the defense [that] impeded counsel's efforts to raise the claim in state court at the appropriate time." Breard, 134 F.3d at 620 (quoting Murray, 477 U.S. at 488). Even where a petitioner fails to show cause and prejudice for a procedural default, a court must still consider whether it should reach the merits of the petitioner's claims to prevent a fundamental miscarriage of justice. See Schlup v. Delo, 513 U.S. 298, 314 (1995).

The record does not warrant a merits examination of this claim. On appeal, Taylor contended that the trial court failed to instruct the jury as to the elements of robbery with a dangerous weapon against victim Gulliver—the man who withdrew money from his ATM—and attempted robbery with a dangerous weapon of the other victims, the felonies underlying Taylor's convictions for felony murder. Conceding that counsel did not object

---

[6] Habeas petitioners may use an actual innocence claim to excuse the procedural default of a separate constitutional claim upon which they request habeas relief. See Murray, 477 U.S. at 496. "[When] a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Id.; see also Reid v. True, 349 F.3d 788, 806 (4th Cir. 2003), cert. denied, 540 U.S. 1097 (2003). Petitioners who wish to use a claim of actual innocence as a gateway to raising an otherwise defaulted constitutional claim must demonstrate by a preponderance of the evidence that a reasonable juror could not have convicted the petitioner in light of the new evidence. See Buckner v. Polk, 453 F.3d 195, 199–200 (4th Cir. 2006), cert. denied, 549 U.S. 1284 (2007). Nothing in the record demonstrates Taylor's ability to meet this standard.

to the judge's failure to instruct the jury of the elements of the underlying felonies, Taylor

asked the appellate court to review the matter under the plain error doctrine. The Court of

Special Appeals declined to do so, finding the following:

> When issuing his jury instructions, the trial judge stated as
> follows:
>
> > THE COURT: . . . The Defendant is also charged
> > with first-degree felony murder. And I instruct
> > you that in order to convict the Defendant of
> > first-degree felony murder, the State must prove
> > that the Defendant, or another person
> > participating in the crime with the Defendant,
> > committed or attempted to commit a robbery
> > with a dangerous and deadly weapon. That the
> > Defendant or another person participating in the
> > crime with the Defendant, killed the victims in
> > this case. And that the act resulting in the death
> > of the victims occurred during the commission or
> > attempted commission of a robbery with a
> > dangerous and deadly weapon. Felony murder
> > now, does not require the State to prove that the
> > Defendant intended to kill the victim.
>
> > * * *
>
> > BENCH CONFERENCE
>
> [Prosecutor]: Your Honor, you didn't define
> what robbery/deadly weapon was. You need to
> do that. And attempted robbery/deadly weapon.
>
> THE COURT: I did attempt, but I'll (inaudible).
>
> [Prosecutor]: Okay.
>
> THE COURT: Theft, theft, theft. There it is,
> robbery/deadly weapon. That's what you get for
> giving me stuff at the last minute Mr. Giblin.
> Step back. (Inaudible) going to go up to two
> hours. Do you know where attempt is? 123.

Robbery with a dangerous and deadly weapon and attempted robbery. Okay. Back off then.

[Defense counsel]: Judge, aren't you going to ask me if I have any exceptions?

THE COURT: Do you have any? I asked it generally.

[Defense counsel]: No, you asked Mr. Giblin. All right, I do have one Your Honor.

THE COURT: Which is?

[Defense counsel]: And that is with respect to the instruction on identification. The one sentence that I love in that instruction is one that you messed up.

\* \* \*

THE COURT: Okay, I'll reread that part.

Prosecutor]: No, no, no, no. I would ask-and you do it after you do the robbery/deadly weapon.

THE COURT: The robbery/deadly weapon. Okay Counsel.

[Prosecutor]: Thank you.

(Bench Conference concluded)

THE COURT: Madam Forelady, ladies and gentlemen of the jury and alternates, I further instruct you that the Defendant is charged with attempted robbery/deadly weapon and robbery with a dangerous and deadly weapon. And-

[Prosecutor]: Excuse me, Your Honor.

THE COURT: Attempted. Come back up.

BENCH CONFERENCE

[Prosecutor]: He wasn't charged Judge.

THE COURT: Okay.

[Prosecutor): (Inaudible).

THE COURT: That's part of the felony, okay. Thank you.

(Bench Conference concluded)

THE COURT: The Defendant is not charged with attempted robbery with a dangerous and deadly weapon, or robbery with a dangerous and deadly weapon. However, if you remember when I talked about the felony murder and I talked about those items which are those things which could lead to felony murder, robbery and attempted robbery with a dangerous and deadly weapon was among them. Therefore in order to convict the Defendant of that, the State must prove all of the elements of robbery and must also prove that the Defendant committed the robbery, or attempted robbery, using a dangerous and deadly weapon. Again, an attempt to commit and [sic] offense, an attempt is a substantial step beyond mere preparation toward the commission of a crime. In order then to convict the Defendant of that, the State must prove that the Defendant took a substantial, or took substantial steps beyond mere preparation toward the commission of a robbery with a dangerous and deadly weapon. . . .

The judge then moved on to a discussion about the identification of the defendant as the person who committed the crimes, with no further enumeration of the elements of robbery or attempted robbery with a dangerous weapon. After the judge finished instructing the jury, he called counsel to the bench and asked each attorney if there were any exceptions. Each replied, "No," and proceeded to closing arguments. In

addition, defense counsel did not bring up the issue of the lack of instruction on the elements of robbery and attempted robbery at the hearing on the motion for new trial. Appellant here, however, again asks that we invoke the plain error doctrine to correct counsel's failure to object below. Again, we decline to do so.

Md. Rule 4-325 governs instructions to the jury and states, in pertinent part:

> (c) How given. The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

> \* \* \*

> (e) Objection. No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury. An appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object.

Maryland courts have consistently held that the requirements of Md. Rule 4-325(c) are mandatory and that a trial judge must give a requested instruction that correctly states the applicable law and has not been fairly covered in the instructions actually given. The failure to give such an instruction constitutes error. Mack v. State, 300 Md. 583, 592 (1984). Thus, the trial judge erred in failing to complete his instruction to the jury on the elements of attempted robbery and robbery with a dangerous

and deadly weapon, as the instruction had been requested and applied to the charged offenses.

Rule 4-325(e) makes it clear that a failure to object to the giving or the failure to give a jury instruction at trial ordinarily constitutes a waiver of a claim that the instructions were erroneous. Morris v. State, 153 Md. App. 480, 509 (2003). Rule 4-325(e) grants us "'plenary discretion to notice plain error material to the rights of a defendant, even if the matter was not raised in the trial court.'" Brown v. State, 169 Md. App. 442, 457 (2006), cert. denied, 395 Md. 56 (2006) (quoting Danna v. State, 91 Md. App. 443, 450 (1992)). In the context of erroneous jury instructions, however, the plain error doctrine has been noticed sparingly. Conyers v. State, 354 Md. 132, 171 (1999). The plain error hurdle, "'high in all events, nowhere looms larger than in the context of alleged instructional errors.'" Martin v. State, 165 Md. App. 189, 198 (2005), cert. denied, 391 Md. 115 (2006) (quoting U.S. v. Sabetta, 373 F.3d 75, 80 (1st Cir. 2004)). Indeed, with regard to reviewing alleged error in jury instructions, our appellate courts have been "'rigorous in 'adhering steadfastly to the preservation requirement.'" McMillan v. State, 181 Md. App. 298, 358 (2008) (quoting Morris, 153 Md. App. at 508).

Although error has been noted, appellant should not "suffer the misapprehension that if the instructional error, even in the absence of an objection, is plain and material to the rights of the accused, the appellate court is thereby divested of its discretion and is required to consider the contention on its merits. The appellate discretion is not so cabined. . . . The fact that an error may have been prejudicial to the accused does not, of course, ipso facto guarantee that it will be noticed." Id. at 512. Even the likelihood of reversible error is "no more than a trigger for the exercise of discretion and not a necessarily dispositive factor." Id. at 513. See also, Sine v. State, 40 Md. App. 628, 632 (1978).

In this matter, we first note that the instruction at issue was requested by the State, not by the defense, and that the defense took no exception to the trial judge's failure to give the instruction. Further, it would appear that the judge's failure related more to inadvertence than intent; he began to give the instruction requested by the State but then veered off on a

tangent about the definition of "attempt." Neither party appeared to notice the error, nor objected. Had the judge's failure to complete the instruction on robbery with a dangerous weapon been brought to his attention, as Rule 4-325(e) requires for preservation, there is nothing to suggest that he would not immediately have corrected himself and completed the instruction. The purpose of the rule is to give the trial judge an opportunity to correct any error in his instructions. Sine, supra, 40 Md. App. at 633. Here, the failure of either party to object did not afford the judge the opportunity to correct himself before the jury retired for its deliberations. In such an instance, appellate review will not ordinarily be permitted. Morris, 153 Md. App. at 509 (citing Bowman v. State, 337 Md. 65, 67 (1994)).

Appellant contends that the issue requires plain error review because the instruction not given related to his conviction of felony murder, the most serious of the charged crimes. We find that argument unpersuasive. In Conyers v. State, 354 Md. 132 (1999), the defendant was subject to capital punishment for his crimes. His claims were not preserved for appellate review, but he requested a relaxation of the preservation requirement because of the dire nature of his potential punishment and because earlier capital cases suggested that such action was appropriate. The Court of Appeals, reiterating its statement in Bruce v. State, 328 Md. 594, 611 (1992), held that "'despite the special character of a capital case, the tried and tested rules of evidence and procedure still apply. Both sides should play by the rules.'" Conyers, 354 Md. at 150. The Court affirmed Conyers' convictions for premeditated murder and robbery, among others, because he failed to preserve the majority of his issues for appellate review. The present case is no more special.

As in Conyers, we note that "[c]ounsel should not rely on this Court, or any reviewing court, to do their thinking for them after the fact." Id. at 151. Appellant had every opportunity to object at trial to the judge's failure to give the instruction that the defense had not even requested from the start, but for whatever reason, did not do so.

Moreover, we are not persuaded that appellant suffered any real harm or was denied a fair trial by the trial judge's failure to give the instruction on robbery and attempted robbery.

While the judge did not expound on all the elements to be proved, the jury was adequately made aware of the essential elements during the prosecutor's closing argument. During closing, the prosecutor set forth his theory of first degree murder and then moved on to a discussion of felony murder:

> But we have another type of murder that is equally in play here. And that is what the Judge defined to you as felony murder. And that basically the rule says if you commit a . . . homicide during the course of committing or attempting to commit another felony, you're guilty of felony murder. . . . We have-do you remember what Shawn Brown said? Shawn Brown said before the murders took place, the man with the gun, the man who we say is Derrick Taylor, told him and the other people to kick out their money, . . . [b]ut they didn't have any money to give. So there was an attempt to rob Shawn Brown, . . . Steven Matthews, . . . Jerry Moreland, . . . Antoine [sic] Arthur. . . . Now, we also have a robbery with a deadly weapon. Do you think Nathan Gulliver was robbed that night? Of course he was robbed. Why did Nathan Gulliver give that money? Why did he give that money? I understand he was a good soul and he wanted to help, but let's get down to primal instincts. There's a man waving a gun, it's an explosive situation, he's scared. Let me go, I'll get some money. And he goes and gets [the] last $140 he had in his bank account leaving five dollars and gives this stranger the money. Why? Because the guy threatened him with the gun. That is robbery with a dangerous and deadly weapon. And when Antoine [sic] Arthur is killed, when Steven Matthews is killed, and when Nathan Gulliver is killed, that is homicide felony murder.

The Maryland Criminal Pattern Jury Instructions ("MPJI-CR") define "robbery" as the taking and carrying away of property (anything of value) from someone else by force or threat of force, with the intent to deprive the victim of the property.

MPJI-CR 4:28 (2005). Robbery with a dangerous weapon further requires the State to prove that the defendant committed the robbery by using a dangerous weapon, i.e., an object capable of causing death or serious bodily harm. MPJI-CR 4:28.1 (2001). Finally, "attempt" is defined as a substantial step, beyond mere preparation, toward the commission of a crime with the intent to commit the crime. MPJI-CR 4:02 (1997). For all the reasons enumerated above, we decline to exercise our discretion to review the matter under the plain error doctrine.

(CSA Op. at 20–28). The appellate court refused to review the merits of this claim on the basis of an adequate and independent state procedural rule. Federal review of this procedurally defaulted claim is likewise declined.

### 3.       Suppression of In-Court Identification

Taylor contends that the trial judge erred in failing to suppress Brown's in-court identification of him as one of the gunmen based on impermissibly suggestive communications between Brown and Detective Bealefeld prior to the suppression hearing. As noted by the appellate court, prior to the suppression hearing regarding Brown's photo array identification of Taylor, Bealefeld spoke to Brown outside the courtroom to prepare Brown for the fact that Taylor was present. (CSA Op. at 10–11, 36–37). Taylor argued on appeal that this communication tainted Brown's in-court identification and that the trial judge abused his discretion in allowing the identification. (Id. at 36).

At the suppression hearing, Taylor sought to suppress Brown's identification of him as one of the gunmen based on a photo array presented to Brown while he was recovering from gunshot wounds at Shock Trauma. Taylor argued that Brown was under the influence of strong pain medication and that his mind was thus not clear when he made the photo

array identification. Further, Taylor argued that because his picture was in the top position on the photo array and the other pictures had a different background, Brown's eye was simply drawn to the picture of appellant, and the array was thus unduly suggestive. The prosecutor argued that Brown previously testified that he had a good look at the gunmen during the thirty- to forty-minute incident and that the detectives did not influence his identification. The judge found nothing impermissibly suggestive in the photo array and declined to suppress it. (Id. at 35–36).

The public defender later received a call from the prosecutor who stated he saw Bealefeld speak to Brown prior to Brown entering the courtroom to testify at the suppression hearing. Defense counsel again moved to suppress any in-court identification of appellant by Brown as tainted or, alternatively, to keep witness Brown from testifying altogether. Based on Brown's clear expression that he saw the gunman and would "never forget that face," the judge found that there was nothing improper in the communication with Bealefeld that influenced Brown's identification. (Id. at 38). Taylor again raised the issue at trial, having the original prosecutor testify as to what transpired between Brown and Bealefeld. (Id. at 37–38).

The Due Process Clause of the Fourteenth Amendment protects individuals from unreliable identifications that stem from impermissibly suggestive procedures. Manson v. Brathwaite, 432 U.S. 98, 113 (1977); Neil v. Biggers, 409 U.S. 188, 198 (1972) ("It is the likelihood of misidentification which violates a defendant's right to due process[.]"). The possibility of such misidentification was examined on direct appeal and no taint was found. Given the time Brown spent in close proximity with the gunmen and his unwavering

identification of Taylor on multiple occasions, the appellate court's findings survive scrutiny under 28 U.S.C. § 2254(d).[7]

## B.   Sufficiency of the Evidence

Any challenge to sufficiency of evidence is necessarily a due process challenge. West v. Wright, 931 F.2d 262, 266 (4th Cir. 1991), rev'd on other grounds, 505 U.S. 277 (1992). In determining whether there is sufficient evidence to support a conviction, a court must examine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The fact finder, rather than the reviewing court, is charged with "resolv[ing] conflicts in the testimony, [weighing] the evidence, and [drawing] reasonable inferences from basic facts to ultimate facts." Id. Circumstantial as well as direct evidence must be considered and the prosecution must be given the benefit of all reasonable inferences. See United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982). Circumstantial evidence alone can be sufficient to support a conviction. See Stamper v. Muncie, 944 F.2d 170, 174 (4th Cir. 1991).

On direct appeal, Taylor asserted his claim that the evidence was insufficient to sustain his felony murder conviction. The appellate court found the claim was not preserved for appellate review, (CSA Op. at 31–33), but noted that "[e]ven had the matter

---

[7] A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." Williams v. Taylor, 529 U.S. 362, 405 (2000).

been preserved," the evidence "undisputedly" showed that the "murders occurred during the robberies." (<u>Id.</u> at 34–36). The appellate court further noted that Taylor "did not argue that he did not rob a victim; he merely contends that the robbery had ended before the murders such that the felony murder rule would not apply." (<u>Id.</u> at 36). The court noted, "[a]s the robbery was the felony underlying the felony murder, and the murders were in furtherance of the common enterprise of the robbery, the jury could reasonably have found that victims Matthews and Gulliver were killed to eliminate them as witnesses to the murder of Antwon Arthur and that all the killings occurred during the commission or attempted commission of a robbery with a dangerous weapon." (<u>Id.</u>).

This analysis stands. First, this claim is procedurally defaulted under <u>Coleman</u>. 501 U.S. at 749–50. Second, even if it were not, the record as a whole provides sufficient evidence to support Taylor's conviction for felony murder pursuant to 28 U.S.C. § 2254(d)(2).

## C.      <u>Ineffective Assistance of Trial Counsel</u>

To demonstrate ineffective assistance of counsel, Taylor must show both (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced his defense. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). The second prong requires the Court to consider whether there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. A strong presumption of adequacy attaches to counsel's conduct; a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors. <u>Id.</u> at 696.

"[A] state court conclusion that counsel rendered effective assistance of counsel is not a finding of fact binding on the federal court to the extent stated by [former] 28 U.S.C. § 2254(d) [now § 2254(e)(1)]." Id. at 698. Rather, "[a]lthough state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254[(e)(1)], . . . both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." Id. Thus, the state court's conclusion that Taylor's trial counsel rendered effective assistance of counsel does not preclude this Court from granting relief on this claim.

Under Strickland, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686 (emphasis added). Applying this standard, the Court now examines Taylor's five[8] remaining ineffective assistance claims.

### 1.    Failure to Notify Court of Taylor's Election to Testify

The Sixth Amendment's Confrontation Clause and the Fourteenth Amendment's Due Process Clause permit a defendant to testify if he decides it is in his interest to do so.

---

[8] As noted above, Taylor's first claim that counsel failed to object to an incomplete felony murder instruction and his third claim concerning a voir dire question regarding racial bias were presented and rejected on direct appeal in the context of trial court error. The post-conviction court agreed with the appellate court determinations and noted no prejudice resulted regarding the instruction as given or the rejected voir dire question. (Post-Conv. Filings at 6–7). Taylor's eighth claim, that trial counsel failed to file a motion seeking modification or reduction of sentence, was addressed directly at his post-conviction hearing, wherein the State agreed that Taylor should be permitted to file a belated motion seeking modification. An order permitting the motion was signed on September 2, 2015. (Id. at 4).

Rock v. Arkansas, 483 U.S. 44 (1987). Although a defendant needs to be aware of his right to testify in order to waive it, a trial court need not advise a defendant of that right and secure a waiver of the right on the record. See United States v. McMeans, 927 F.2d 162 (4th Cir. 1991).

At his post-conviction hearing, Taylor conceded that he was advised of his right to testify as well as his right against self-incrimination. (Feb. 20, 2007 Post-Conviction Tr. at 106–07, ECF No. 54-5). He complained, however, that trial counsel failed to inform the court of his election to testify. Based on this testimony and that of trial counsel, Sharon May, Esq., the post-conviction court found as follows:

> During the post-conviction hearing, Petitioner's trial counsel, Sharon May, Esq., testified that she discussed the advantages and disadvantages of testifying with Petitioner before trial. Ms. May also testified that she and the Petitioner had come to an agreement that, in lieu of testifying, Petitioner would simply display his tattooed arms to the jury as a means of challenging the identification of Petitioner by a State's witness. Also during the hearing, Petitioner testified that he told Ms. May that he would testify if he needed to. Petitioner has not identified anywhere in the record an unequivocal request or demand of his attorney to testify which was ultimately denied. Upon consideration of the record and the testimony during the post-conviction hearing, this court finds that Petitioner knowingly and intelligently waived his right to testify. Furthermore, the court finds that trial counsel's decision not to call Petitioner as a witness was a matter of trial strategy and not a deficient act for which post-conviction relief is warranted.

(Post-Conv. Filings at 5). This determination is supported by the record and will not be disturbed pursuant to 28 U.S.C. § 2254(d).

## 2.    Failure to Object to a Non-Unanimous Verdict

As explained by the post-conviction court, Taylor's allegations of error regarding counsel's failure to object to omitted instructions requiring a unanimous verdict provides no ground for relief. Counsel did not insist on such an instruction, nor did counsel object when the foreperson was not polled and the jury harkened. Moreover, these omissions do not render the jury verdict non-unanimous.

At his post-conviction hearing, Taylor maintained that jurors two through twelve were polled but the foreperson was not and, as a result, the verdict was not unanimous. (Aug. 17, 2015 Post-Conviction Tr. at 5–6, 22). He further argued that this deficiency was exacerbated because when the jury was harkened, nobody responded. (Id.)

The post-conviction court found no deficiencies based on the process by which the verdict was received and recorded. (Post-Conv. Filings at 8–9). Although a verdict is not final until announced and accepted in open court without dissent by jurors, United States v. Chinchic, 655 F.2d 547, 550 (4th Cir. 1981), the polling of the jury is not of constitutional dimension, United States v. Carter, 772 F.2d 66, 67 (4th Cir. 1985). Accordingly, these grounds are not cognizable in the context of federal habeas corpus review.

## 3.    Failure to Secure Presence at Bench Conferences

A defendant has a Sixth Amendment right to be present during proceedings where his presence has a reasonably substantial relationship to his opportunity to defend himself, United States v. Gagnon, 470 U.S. 522 (1985), reh'g denied, 471 U.S. 1112 (1985), or where his exclusion would interfere with his opportunity for cross-examination, Kentucky

v. Stincer, 482 U.S. 730 (1987). Taylor argues counsel should have objected when the jury sent a note requesting all of the answers to their questions which had been previously asked. (Post-Conv. Filings at 9). While the record did not indicate whether Taylor was present during this communication or had waived his presence, the record did reflect that all the previous questions and answers were reviewed by counsel and provided to the jury, and those answers did not contain new information, but merely consisted of information jurors previously had in their possession. (Id. at 10). There was no prejudice to Taylor as a result of the communication, and the post-conviction court's denial of relief on this claim is reasonable, supported by the record, and provides no basis for relief pursuant to 28 U.S.C. § 2254(d).

## D.  <u>Ineffective Assistance of Appellate Counsel</u>

Taylor next asserts that appellate counsel was ineffective both for failing to question the validity of the non-unanimous verdict and for failing to raise an issue regarding omitted jury instructions. In the context of claims regarding the effective assistance of appellate counsel, the Supreme Court has made clear that an indigent defendant does not have a constitutional right to compel his appointed appellate counsel to raise every conceivable claim on appeal. Jones v. Barnes, 463 U.S. 745, 751 (1983). Further, the Court observed that "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Id. at 751–52.

The Circuit Court rejected Taylor's claims of ineffective assistance of appellate counsel on post-conviction review. As previously noted, the post-conviction court found

that the verdict was unanimous, and the jury was properly polled and hearkened. (Post-Conv. Filings at 12). Likewise, the claim of omitted or incomplete jury instructions was examined on direct appeal. There, the Court of Special Appeals found that although the trial judge erred in not providing a complete jury instruction on felony murder, plain error review was not warranted because "the jury was adequately made aware of the essential elements during the prosecutor's closing arguments." (CSA Op. at 27; see also Post-Conv. Filings at 7–8). The appellate court's findings provide no basis for relief under 28 U.S.C. § 2244(d).

## E.    Cumulative Error

Taylor's final claim is that the cumulative effect of the above-listed errors rendered the trial unfair. Pursuant to the cumulative error doctrine, "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir. 1990); see also United States v. Martinez, 277 F.3d 517, 532 (4th Cir. 2002); United States v. Basham, 561 F.3d 302, 330 (4th Cir. 2009).

Generally, if a court "determine[s] . . . that none of [a defendant's] claims warrant reversal individually," it will "decline to employ the unusual remedy of reversing for cumulative error." United States v. Fields, 483 F.3d 313, 362 (5th Cir. 2007). To reverse for cumulative error, the errors must "so fatally infect the trial that they violated the trial's fundamental fairness." Basham, 561 F.3d at 330 (quoting United States v. Bell, 367 F.3d 452, 471 (5th Cir. 2004)). When "none of [the trial court's] individual rulings worked any

cognizable harm [on the defendant,] . . . [i]t necessarily follows that the cumulative error doctrine finds no foothold[.]" United States v. Sampson, 486 F.3d 13, 51 (1st Cir. 2007).

In the Fourth Circuit, the cumulative error doctrine is not generally recognized because "legitimate cumulative-error analysis evaluates only the effect of matters actually determined to be constitutional error, not the cumulative effect of all of counsel's actions deemed deficient." Fisher v. Angelone, 163 F.3d 835, 853 n.9 (4th Cir. 1998); see also Arnold v. Evatt, 113 F.3d 1352, 1364 (4th Cir. 1997); Higgs v. United States, 711 F.Supp.2d 479, 552 (D.Md. 2010) (finding in the context of collateral review that review based on the cumulative effect of errors is available only where individual constitutional errors are found).

In declining Taylor's cumulative error claim, the post-conviction court stated that Taylor had failed to demonstrate "any errors constituting deficient acts on the part of trial or appellate counsel." (Post-Conv. Filings at 13). Having examined the state court rulings and having independently examined the record, this Court is satisfied that when applying the Strickland standard to Taylor's allegations of trial counsel's allegedly deficient performance, Taylor has not demonstrated the prejudice necessary to establish ineffectiveness on the part of trial or appellate counsel. See 28 U.S.C. § 2254(d); see also Stamper, 944 F.2d at 178. The state courts' rejection of Taylor's cumulative error claim is neither contrary to clearly established federal law, nor did it involve an unreasonable application of federal law pursuant to 28 U.S.C. § 2254(d).

**F.**     **Certificate of Appealability**

Rule 11(a) of the Rules Governing Section 2254 Cases provides that a district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Because the accompanying Order is a final order adverse to the applicant, 28 U.S.C. § 2253(c)(1) requires issuance of a certificate of appealability before an appeal can proceed.

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see Buck v. Davis, 137 S.Ct. 759, 773 (2017). The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong[,]" Tennard v. Dretke, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further[,]" Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). Because this Court finds that there has been no substantial showing of the denial of a constitutional right, a certificate of appealability shall be denied. See 28 U.S.C. § 2253(c)(2).

Taylor may still request that the Fourth Circuit issue such a certificate. See Lyons v. Lee, 316 F.3d 528, 532 (4th Cir. 2003) (considering whether to grant a certificate of appealability after the district court declined to issue one).

## IV.   CONCLUSION

For the foregoing reasons, the Petition for a Writ of Habeas Corpus (ECF No. 1), as amended, will be DENIED. The Court will not issue a certificate of appealability. A separate Order shall issue.


Date: October 30, 2020                                     _____/s/_____
                                                          George L. Russell, III
                                                          United States District Judge